DECISION AND JOURNAL ENTRY
{¶ 1} Defendant/Appellant, Robert E. Ray, appeals his conviction and sentence in the Wayne County Court of Common Pleas. We affirm.
 {¶ 2} Two motorcycles belonging to James Snyder were stolen from the yard of Belinda Palmer in Sterling, Ohio on July 6, 2007. On July 31, 2007, an indictment was issued naming Defendant in the subject line and co-defendant Eddie Persinger in the body of the document. On August 2, 2007, the trial court issued a judgment entry amending the indictment to substitute Defendant's name and Defendant's girlfriend's name (Amanda Stillings) in place of Persinger's name. The indictment charged Defendant and Stillings with two counts of receiving stolen property in violation of R.C. 2913.51, felonies of the fourth degree. Defendant was tried to the bench on January 24, 2008, convicted of both counts on January 25, 2008, and sentenced to eighteen months in prison on each count, to be served concurrently. Defendant timely appealed and raises three assignments of error. *Page 2 
 Assignment of Error No. I "The trier of fact's finding that [Defendant] violated section 2913.51 of the Ohio Revised Code, knowingly receiving stolen property, is against the manifest weight of the evidence."
 {¶ 3} Defendant argues that his conviction is against the manifest weight of the evidence because there was no evidence to establish that Defendant knew the motorbikes were stolen. We disagree.
 {¶ 4} When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power may only be invoked in extraordinary circumstances if the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 5} Defendant was convicted of two counts of receiving stolen property in violation of R.C. 2913.51(A), which states that "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 6} Belinda Palmer testified that the motorbikes at issue were stolen from her front yard. Palmer described the motorcycles as being a Suzuki and a Yamaha with the numbers "319" on them. Palmer stated that one motorcycle was blue and one was yellow. *Page 3 
 {¶ 7} James Snyder testified that he owned the two motorcycles and described them. Snyder testified that sometime during the morning of June 6, 2007, he saw the blue Yamaha, which had been damaged, laying in the back of a truck at a gas station.
 {¶ 8} Crystal Snyder testified that her husband owned the motorcycles and described them. Snyder stated that on the morning of June 6, 2007, she "saw two vehicles on the side of the road, um people were standing outside and there was two people pushing the [blue] bike up a hill that was kind of grassy and there was woods in the background behind that." Snyder explained that two young men were pushing the bike and a male and female were standing by the vehicles. Snyder stated that she saw the men load the bike into the back of an older S-10 vehicle and identified the second vehicle as being a Dodge Durango with temporary tags.
 {¶ 9} Snyder testified that the trucks then drove to a Circle K gas station and she parked at a pump to watch them. Snyder said one of the men got out of the passenger side of the S-10 and walked towards the gas station. Snyder indicated that he turned around, looked at her, then "immediately went over and got into the Durango, the back of the Durango, uh, slid across the seat and the Durango took off." The other passenger of the S-10 then went into the gas station. Snyder explained that the remaining man (Ed Persinger) was still at the gas station when police arrived and that she identified the man who drove off in the Durango from a photo array as Tommy Rouse.
 {¶ 10} Deputy Steve Browning testified that he responded to the Circle K. Browning testified that he saw the truck with the bike in the back and questioned its driver, Eddie Persinger. Browning indicated that Eddie Persinger explained that a young man had been with him earlier, who was later identified as Tommy Rouse. Browning finally stated that he did not see a Dodge Durango at the scene. *Page 4 
 {¶ 11} Danica Saurers testified that on the morning of June 6, 2007, she was driving on N. Kansas Road when a "dirt bike ran a red — ran a stop sign, pulled out in front of the car that was in front of me and then a Dodge Durango pulled behind the car that was in front of me so it was kind of in front of me, passed that car and just sped up South Elm Street Extension" where she lost them. Saurers testified that the vehicles were traveling at a high rate of speed. Saurers testified that a blond person was driving a yellow bike. Saurers stated that the Durango had a 30-day tags on it and was occupied by two persons. Saurers explained that she saw the Durango again when she stopped at a BP Station and that it was occupied by a male and a female. Saurers testified that she was able to identify the driver of the Durango from a photo array as Defendant and that she recognized Defendant as having gone to school with her.
 {¶ 12} Deputy Scott Reiss testified that he responded to the Palmer residence. Reiss testified that he saw a log chain that looked like it had been cut by bolt cutters, bike tracks from the yard to the road, and two different sets of shoe tracks. Reiss then reported to the Circle K where other officers had already spoken to Persinger. Finally, Reiss testified that he interviewed Saurers and her testimony at trial was consistent with that interview. Reiss explained that he prepared the photo array that included Defendant's picture and that Saurers identified Defendant from that array.
 {¶ 13} Reiss explained that he located Ray at the registered address of the Durango, which was owned by Stillings. Reiss indicated that he interviewed both Stillings and Defendant and that Stillings admitted involvement. Reiss explained that Defendant initially denied any knowledge of the events but later stated that, "it was Tommy's [Rouse] deal[.]" Reiss stated that Ray told him that he and Stillings drove the Durango to meet Rouse and Persinger and then followed them to get the blue bike, which was "off the side of the road in the weeds." Defendant *Page 5 
stated that he did not touch the bike but watched it being loaded into the truck. Defendant finally told Reiss that he followed Persinger and Rouse to the Circle K, that Rouse got into the Durango, that he dropped Rouse off in Orrville, and that he then returned to Akron. Reiss explained that Defendant also admitted to following Rouse earlier on a yellow dirt bike as testified to by Saurers. Reiss identified Defendant's statement, in which Defendant stated, among other things, that Persinger "would be an idiot if he didn't know [the bike] was stolen."
 {¶ 14} Tommy Rouse, who was serving a sentence for receiving the stolen property that was the subject of the instant trial testified that Persinger had asked him "to help him go pick this bike up." Rouse explained that he called Defendant to meet and follow them because he did not want to run out of gas. Rouse stated that Defendant followed them to the gas station as planned. Rouse testified that he was smoking crack at the time and got "spooked" and paranoid at the gas station when he saw a lady looking at him and asked Defendant to give him a ride to Orrville. Rouse finally testified that he did not discuss the two dirt bikes with Defendant and that Defendant did not assist them in any way with the bikes. During cross-examination, Rouse admitted that Defendant was his cousin.
 {¶ 15} Defendant's testimony about the events was substantially similar to Rouse's testimony. Defendant explained that when he saw the motorbike being pushed out of the woods, he thought the bike might have been out of gas. Defendant also explained, however, that although no one told him anything about the bike, he knew that Persinger and Rouse were "on drugs and I assumed [the bike] had to do something with drugs." Defendant indicated that his statement about Persinger referred to the fact that by the time the police spoke to him about the bikes, Persinger was already in custody and Defendant assumed that Persinger knew by then that the bikes were stolen. Defendant denied following the yellow dirt bike. *Page 6 
 {¶ 16} Based on the foregoing, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State and convicted Defendant of receiving stolen property. Although there was no direct evidence that Defendant stole the motorbikes, the evidence at trial would have allowed the trier of fact to conclude that Defendant knew the bikes were stolen. There was evidence that Defendant followed the yellow bike and then later was present when the blue bike was pulled from the weeds and loaded into a truck. Defendant then followed the truck containing the blue bike to the gas station and gave one of the occupants of the truck a ride. Defendant admitted that he thought the bikes were related to drug use and that Persinger had to have known they were stolen. Based on the foregoing, a trier of fact could have also determined that Defendant had to have known the bikes were stolen, i.e., that Defendant had knowledge of the circumstances. See R.C. 2901.22(B).
 {¶ 17} Having reviewed the evidence in this case, along with the reasonable inferences that can be drawn therefrom, this Court concludes that Defendant's conviction for receiving stolen property is not against the manifest weight of the evidence. Defendant's first assignment of error is overruled.
 Assignment of Error No. II "The trial court erred as a matter of law in sentencing [Defendant] to a term greaterthan [sic] the minimum sentence."
 Assignment of Error No. III "The trial court abused its discretion in sentencing [Defendant] to a term greaterthan [sic] the minimum sentence."
 {¶ 18} In his second and third assignments of error, Defendant argues that the trial court erred when it sentenced him to the maximum sentence of 18 months imprisonment on each count, rather than the minimum sentence. We disagree. *Page 7 
 {¶ 19} When reviewing a trial court's sentence, we "[f]irst * * * examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment is reviewed under the abuse-of-discretion standard."State v. Kalish, Slip Opinion No. 2008-Ohio-4912, at ¶ 26. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. An abuse of discretion demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Ports v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. Id.
 {¶ 20} As we held in State v. Hultz, 9th Dist. No. 07CA0043,2008-Ohio-4153:
 "In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the Ohio Supreme Court held that the parts of Ohio's felony sentencing statutes that required judicial factfinding before a trial court could impose maximum sentences, consecutive sentences, or sentences greater than the minimum violated the Sixth Amendment to the United States Constitution. The Court severed the unconstitutional parts of the sentencing statutes, but enforced the rest. The Court also concluded that trial courts have discretion to impose a sentence within the statutory range without the need for findings of fact with respect to maximum sentences, consecutive sentences, or sentences greater than the minimum. After Foster, courts are to `consider' factors related to the seriousness of a defendant's conduct and the likelihood of recidivism, but pre-Foster findings are neither required nor permitted." (Internal citations omitted.) Hultz at ¶ 12.
 {¶ 21} Based on the foregoing, our review of the record and the transcript of Defendant's sentencing, we hold that the trial court complied with all applicable rules and statutes in imposing the sentence and the same is not clearly and convincingly contrary to law. We further hold that the trial court did not abuse its discretion in sentencing Defendant. Defendant's prison term of eighteen months on each count is the maximum permitted for a fourth-degree felony and, *Page 8 
is therefore within the permitted range. See R.C. 2929.14(A)(4). It is clear from the sentencing entry and the transcript that the trial court considered the purposes of felony sentencing, the seriousness of the offenses, and Defendant's likelihood of recidivism. The trial court also noted that Defendant was currently serving a sentence for a parole violation from an aggravated robbery sentence. The trial court did not abuse its discretion when it sentenced Defendant.
 {¶ 22} Defendant's second and third assignments of error are overruled.
 {¶ 23} Each of Defendant's assignments of error is overruled, and the judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
 Costs taxed to Appellant. *Page 9 
 WHITMORE, J., DICKINSON, J. CONCUR *Page 1